### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

3:13-cr-00011-TCB-RGV

KEVIN GRAHAM

### ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
### REPORT, RECOMMENDATION, AND ORDER

Attached is the Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Cr. R. 58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this 28th day of May, 2014.

_Russell G. Vineyard_

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

KEVIN GRAHAM

CRIMINAL CASE NO.

3:13-cr-00011-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Kevin Graham ("Graham") is charged in a two-count indictment with knowingly receiving and distributing child pornography in violation of 18 U.S.C. § 2252(a)(2)(A), and knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  [Doc. 1].[1]  Graham has moved to suppress evidence and his statements, [Docs. 14, 17, 18 &19],[2] and following an evidentiary hearing on

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Graham filed his initial motion to suppress statements on October 21, 2013, [Doc. 14], and he filed an amended motion to suppress statements on October 30, 2013, [Doc. 19].  Likewise, Graham filed his first motion to suppress evidence on October 29, 2013, [Doc. 17], while he filed a "second" motion to suppress evidence on October 30, 2013, [Doc. 18].  On February 24, 2014, the government filed a response to all of Graham's motions.  [Doc. 33].

January 15, 2014,[3] the parties filed post-hearing briefs, [Docs. 33, 41 & 45]. For the

following reasons, it is **RECOMMENDED** that Graham's motions to suppress

evidence and statements, [Docs. 14, 17, 18 &19], be **DENIED**.

## I. STATEMENT OF FACTS

In April of 2012, the Department of Homeland Security, Homeland Security

Investigations, Immigration and Customs Enforcement ("HSI/ICE"), initiated a

peer-to-peer file-sharing investigation in order to identify individuals in the Atlanta

area involved in the distribution of child pornography via the Internet. (Def. Ex. 1

(Application & Affidavit for Search Warrant of May, 2012), ¶ 7).[4] On March 28, 2012,

Special Agent Anthony Scott ("Agent Scott"), made a query of the RoundUp Ares[5]

---

[3] See [Doc. 34] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties submitted exhibits which will be referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Graham's exhibits.

[4] Peer-to-peer file-sharing is a "method of communication available to Internet users through the use of special software," whereby computers are "linked together through the Internet" and "form a network that allows for the sharing of digital files between users on the network." (Def. Ex. 1, ¶ 7). After obtaining peer-to-peer software, the user may set up files on a computer to be shared with others running a compatible software program and the user then "obtains files by opening the [peer-to-peer] software on the user's computer and conducting searches for files that are currently being shared on another user's computer." (Id.). A peer-to-peer file transfer is "assisted by reference to an Internet Protocol (IP) address," which is "unique to a particular computer during an online session." (Id. ¶ 9).

[5] RoundUp Ares is a software program used by law enforcement to download files from a single, target IP source located on the Ares peer-to-peer network. (Def.

peer-to-peer file-sharing network to obtain a list of IP addresses in Georgia that were making available for distribution known or suspected files containing child pornography based on the SHA-1 values previously identified by law enforcement as containing child pornography.  (Id. ¶ 13).  Agent Scott identified IP address 108.217.214.149, located in Fayetteville, Georgia, and later identified as associated with Bruce Parkinson ("Parkinson"),[6] as making available such files.  (Id. ¶¶ 14, 18-21).

On March 30, 2013, Agent Scott utilized RoundUp Ares to form a direct, single-source connection between an undercover ICE computer and the computer

---

Ex. 1, ¶ 10(a)-(i)).  Each file shared on the Ares network has a Secure Hash Algorithm-I ("SHA-I") value, which represents a "unique digital signature" of that file.  (Id. ¶ 10(d)).  RoundUp Ares identifies a targeted IP address as the source of a particular file that is shared on the Ares network by matching the IP address to that file's SHA-I value.  (Id. ¶¶ 10(e)-(i)), 11).  RoundUp Ares is a "modified version of the free downloadable Ares client software," which "adheres to the common Ares protocols and functions exactly the same way as the free public version," with "no additional browsing or downloading capabilities over and above the free public version."  (Id. ¶¶ 11-12).

[6] On April 16, 2012, HSI Special Agent Thomas Harris ("Agent Harris"), obtained an HSI Summons for the production of subscriber information for the IP address 108.217.214.149 in use when child pornography files were downloaded, (Tr. at 9-10; Def. Ex. 1, ¶ 18), and on April 27, 2012, AT&T replied and identified Parkinson as the subscriber with the address of 2493 Redwine Road, Fayetteville, Georgia, (Def. Ex. 1, ¶ 18).  Further investigation by Agent Harris, including a Georgia driver's license query and a search of a National Comprehensive Report as well as Georgia tax property records, all confirmed that Parkinson resided at a single-family residence located at 2493 Redwine Road in Fayetteville, Georgia.  (Tr. at 10-12; Def. Ex. 1, ¶¶ 19-21).

associated with IP address 108.217.214.149.  (Id. ¶ 15).  During the connection, the computer located at IP address 108.217.214.149 transmitted a list of files it had available for public download, which consisted of 50 files "that had been previously identified as containing known or suspected child pornography."  (Id.).  By the following night, the computer located at this IP address shared with the undercover ICE computer three publicly available digital image files, which Agent Scott determined to contain child pornography.  (Id. ¶ 16).

Based on this investigation, Agent Harris applied for and obtained a search warrant for 2493 Redwine Road, Fayetteville, Georgia, authorizing a search for computer storage media and other items which may be used to receive, transmit, or store child pornography.  (Tr. at 9; Def. Ex. 1; Gov. Ex. 1 (Application for Search Warrant of May, 2012)).  A team of about  15 agents, that included Agent Harris, executed the search warrant on May 31, 2012, at approximately 6:20 a.m. (Tr. at 12-13, 27).  Most of the agents entered the residence in a single-file line, commonly referred to as a "stack," while three or four of them secured what appeared to be an adjacent storage shed.  (Tr. at 12-13, 27, 30-31).[7]  The agents then spread throughout the house, which had three levels, to secure the premises and to determine if anyone

---

[7] Prior to entering the house, the agents knocked on the door repeatedly while yelling "Police.  Search Warrant.  Open the door," and, to the best of Agent Harris' recollection, someone inside the house opened the door for them.  (Tr. at 12, 29-30).

was inside.  (Tr. at 13, 32).  As the agents proceeded with guns drawn while yelling, "Police.  Search Warrant," they discovered about five or six individuals, including Graham, inside the house, all but one of whom were adult males.  (Tr. at 14, 32-33).[8] Each of the individuals was placed in handcuffs and transported to a central location within the house.  (Tr. at 13-14, 33-35).[9]  Once the occupants of the house were assembled, the agents removed their handcuffs and explained to them that they were being detained while the agents executed a federal search warrant. (Tr. at 15).[10]

---

[8] Agent Harris testified that the single minor individual found in the home was the son of one of the adult males.  (Tr. at 14, 33).

[9] Agent Harris testified that he "seem[ed] to remember" that the individuals were transported to the front porch and the living room on the ground floor.  (Tr. at 13, 34-35).  He also testified that the occupants were secured both for their own safety and for the safety of the agents, explaining that "when [the agents] clear out a building[, they] don't want to be stumbling over someone [they] have already encountered[.]"  (Tr. at 14); see also (Tr. at 34 (describing how the occupants were pulled aside so that they would not be "harmed by . . . the stack of agents entering the house")).  Agent Harris did not recall whether the agents held the occupants at gunpoint while they were being handcuffed, but he said that he would expect that one agent would have "cover[ed each] individual as [another] agent handcuff[ed] [him]," since that was what they were trained to do.  (Tr. at 34).

[10] Agent Harris stated that the purpose of detaining the occupants during the execution of the search warrant was to "control [the] environment" by preventing them from "contaminating possible evidence" or otherwise "creating an unsafe environment."  (Tr. at 15).  He further noted that the handcuffs were removed from the occupants within 25 minutes of the agents' entry into the house, but perhaps sooner, just "a few minutes after everyone was gathered[.]"  (Tr. at 42).

Approximately twenty-five minutes after the agents' entry into the house, Agent Harris and Agent Westhall escorted Graham to an office in the basement for questioning, while the other agents executed the search warrant and interviewed the remaining occupants.  (Tr. at 15-16, 35-37).[11]  Graham was seated on a sofa in the office, which was well-lit and about "15-x-15 " in dimension, with Agent Harris seated a few feet across from him and Agent Westhall seated nearby.  (Tr. at 16, 38). Agent Harris then introduced himself and Agent Westhall to Graham, and informed Graham that they were looking for a missing girl whose whereabouts were believed to be linked to the residence.  (Tr. at 18, 38-39).[12]  After describing the girl and relating that an image of her had been traced back to the house through "electronic . . . peer-to-peer means," Agent Harris asked Graham if he had seen the girl or was keeping her in the house.  (Tr. at 18, 39).  Graham replied that he did not know about a missing girl or have any images matching her description, but that he did possess

---

[11]  When asked by defense counsel how he and Agent Westhall "communicated to [Graham] that he needed to move" to the basement, Agent Harris said that he told Graham, "[W]e need to talk to you.  Will you come with us please?" (Tr. at 37-38).

[12]  Agent Harris testified that the story of the missing girl was a fictitious account designed to facilitate Graham's cooperation during the interview and to elicit from Graham any information he might have about the use of child pornography in the house.  (Tr. at 18, 41).  In particular, Agent Harris explained that the ruse was intended to elicit a response by making the use or possession of child pornography seem less serious in comparison.  (Tr. at 40-41).

and share images of children which contained child pornography. (Tr. at 18, 41, 43-44, 47).[13] Graham also told the agents which bedroom in the house was his, and he provided the password to his computer located in that room. (Tr. at 19, 44).

Next, Agent Harris asked Graham if he would write a statement about his knowledge of the missing girl, along with "any other information that he thought would be helpful with [the agents'] investigation, including information pertaining to his online activities." (Tr. at 21). Graham agreed and wrote a one-page statement affirming that he did "not have any information about th[e] missing girl," and listing certain search terms that he had previously used on the Ares network to obtain images of child pornography. (Tr. at 19-21; Gov. Ex. 3 (Written Statement)). At some point during the interview, which lasted about 30 minutes, the agents also told Graham that he was not in custody, in response to which Graham indicated that he understood and that "he wouldn't be talking with [the agents] if [he] didn't want to help." (Tr. at 17, 47-48, 52). Finally, the agents thanked Graham for his cooperation and brought him back upstairs, where he was re-seated together with the other occupants of the house while the agents finished executing the search warrant. (Tr. at 51). The agents left the residence about three hours after their initial entry, having

---

[13] Graham further informed the agents of the particular search terms he used to search for child pornography on the Internet, and he stated that he understood that images of nude persons under the age of 18 constituted child pornography. (Tr. at 19, 43-44).

seized two computers, two DVD-Rs, and an internal hard drive.  (Tr. at 45-46, 52; Gov. Ex. 1).[14]

A subsequent peer-to-peer investigation conducted by HSI/ICE, beginning in August of 2013 again revealed that child pornography was being made publicly available by a computer with an IP address linked to the residence owned by Parkinson at 2493 Redwine Road, Fayetteville, Georgia.  (Tr. at 54-55; Def. Ex. 2 (Application and Affidavit for Search Warrant of September, 2013), ¶¶ 6-18).[15] Because Graham had previously been identified "as the individual responsible for possessing and distributing child pornography" at that address, Agent Scott determined that the continued use and trade of child pornography connected with that address "appear[ed] to indicate that Graham ha[d] resumed using the [peer-to-peer] network to access and distribute child pornography."  (Def. Ex. 2, ¶¶ 20-21).[16]

---

[14] All of the items seized belonged to Graham with the exception of one computer.  (Tr. at 45-46; Gov. Ex. 1).

[15] Specifically, between August 31, 2013, and September 3, 2013, Agent Scott used RoundUp Ares to download 12 image files and 1 movie file containing child pornography from a computer at IP address 108.217.214.149.  (Def. Ex. 2, ¶¶ 12-15). Agent Scott then obtained a summons for the production of subscriber information for the IP address  108.217.214.149 in use when  child pornography files were downloaded, (Def. Ex. 2, ¶ 17), and on September 9, 2013, AT&T replied and identified Parkinson as the subscriber with the address of 2493 Redwine Road, Fayetteville, Georgia, (Def. Ex. 2, ¶ 18).

[16] On September 13, 2013, Agent Scott also confirmed that Graham continued to reside at the address.  (Def. Ex. 2, ¶ 22).

Based on the findings of this investigation, Agent Scott obtained an arrest warrant for Graham as well as a search warrant for the residence.  (Tr. at 58; Gov. Ex. 2 (Application for Search Warrant of September, 2013); Def. Ex. 2).

On September 25, 2013, Agents Scott and Westhall, along with two other agents, executed the arrest warrant at a Publix supermarket parking lot at 8:00 a.m. (Tr. at 58-59).[17]  When Graham's vehicle stopped in the parking lot, the agents approached the vehicle with guns drawn, identified themselves as federal agents, and said that they had a warrant for Graham's arrest.  (Tr. at 59, 66).  Graham stepped out of the vehicle, (Tr. at 67), and the agents secured him in handcuffs and placed him into the back seat of the agents' vehicle, (Tr. at 59, 68).[18]  Agent Scott then sat in the driver's seat of the vehicle and immediately read Graham his Miranda[19] rights verbatim from a printed HSI Miranda rights card.  (Tr. at 60, 70; Def. Ex. 3

_____

[17] Graham had previously arranged to meet Agent Scott at this destination after Agent Scott contacted Graham by telephone under the pretense of seeking to employ him for some "handyman work."  (Tr. at 58-59, 65).  Graham arrived as scheduled in a truck driven by a roommate, (Tr. at 59), while Agent Scott arrived with Agent Westhall driving an Expedition, (Tr. at 68).

[18] The roommate was allowed to leave within a minute of Graham's arrest. (Tr. at 67-68).

[19] Miranda v. Arizona, 384 U.S. 436 (1966).

(HSI <u>Miranda</u> Rights Card)).[20]  Specifically, Agent Scott advised Graham that he had the right to remain silent and that any statements he made could be used against him in court.  (Def. Ex. 3).  He further advised him that he had the right to speak to an attorney, to have one present during questioning, and to have one appointed for him if he could not afford one.  (<u>Id.</u>).  Graham replied that he was willing to speak with the agents and proceeded to make incriminating statements in response to Agent Scott's questions.  (Tr. at 60).[21]  Agent Scott recorded the interview with a hand-held recorder that he had placed on the center console of the vehicle.  (Tr. at 60-61, 70; Gov. Ex. 4).  The interview began within a minute of Graham's arrest and lasted for less than five minutes.  (Tr. at 69; Gov. Ex. 4).  Following the interview, the agents drove Graham to a detention center in Atlanta, Georgia.  (Tr. at 61-62).

## II.  DISCUSSION

Graham moves to suppress the statements he made on May 31, 2012, and September 25, 2013, [Docs. 14 & 19], along with any evidence that was obtained as the fruit of those statements, [Doc. 41 at 25].  The government asserts that the

---

[20] At this time, Agent Westhall was seated in the front passenger seat.  (Tr. at 68).

[21] Among other things, Graham admitted that he had purchased another computer after the execution of the search warrant at his residence in May of 2012, and that he used the computer to download and share child pornography from local networks.  (Tr. at 61; Gov. Ex. 4 (Recorded Statement)).

evidence and statements were lawfully obtained and are therefore admissible. [Doc. 33].

**A.**  **Motions to Suppress Statements**

Graham moves to suppress his statements made at the May 31, 2012, interview on the grounds that the statements were obtained in violation of <u>Miranda</u> and were not made voluntarily. [Doc. 41 at 9-25]. He also moves to suppress the statements he made following his arrest on September 25, 2013, [Doc. 19], although he offers no basis for the suppression of these statements in either his motions to suppress statements or his post-hearing brief, <u>see generally</u> [Docs. 14, 19 & 41]. The government responds that Graham's May 31 statements are admissible because <u>Miranda</u> warnings were not required and the statements were voluntary, [Doc. 33 at 10-15], and that the statements of September, 2013, are admissible because they were given after Graham made a valid waiver of his <u>Miranda</u> rights, [<u>id.</u> at 16-18].

**1.**  *Statements of May 31, 2012*

Graham contends that the statements he made to Agents Harris and Westhall during the interview of May 31, 2012, were obtained in violation of <u>Miranda</u> because the statements were elicited while Graham was in custody and the agents failed to administer <u>Miranda</u> warnings. [Doc. 41 at 9-14]. Graham also argues that the agents' fictitious representations about the missing girl subjected him to

"tremendous psychological pressure," which "standing alone[,] is sufficient basis to hold that [his] statements to Agents Harris and Westhall were the product of coercion rather than his own free will." [Id. at 23]. The government counters that Miranda warnings were not required during Graham's May 31 interview because Graham was not in custody at the time, and that Graham's statements were also made voluntarily under the totality of the circumstances. [Doc. 33 at 10-15].

### a. Miranda Violation Claim

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation. See Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). "Statements made in violation of *Miranda* are not admissible at trial." United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted).

Agents Harris and Westhall's questioning of Graham on May 31, 2012, clearly constituted interrogation, but the parties dispute whether Graham was in custody

for <u>Miranda</u> purposes at the time of the interview.  A defendant is in custody under <u>Miranda</u> when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)).  However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." <u>United States v. Matcovich</u>, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting <u>United States v. Muegge</u>, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); <u>see also</u> <u>United States v. Phillips</u>, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984)) ("'The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'").  Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave."  <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Brown</u>, 441 F.3d at 1347).  This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>Brown</u>, 441 F.3d at 1347 (citation and internal marks omitted).

13

Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" Matcovich, 522 F. App'x at 851 (quoting Howes v. Fields, 132 S. Ct. 1181, 1189 (2012)). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal marks omitted) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court is to "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Barry, 479 F. App'x at 299 (quoting Street, 472 F.3d at 1309)). Another relevant factor is the location of the questioning. In particular, "[a]lthough not dispositive, 'courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" Matcovich, 522 F. App'x at 851 (quoting Brown, 441 F.3d at 1348)). Courts should also consider whether a suspect was "unambiguously advis[ed] . . . that he is free to leave and is not in custody." Matcovich, 522 F. App'x at 851 (alterations in original) (citation and

internal marks omitted).  "This is a 'powerful factor' that 'generally will lead to the

conclusion that the defendant is *not* in custody absent a finding of restraints that are

so extensive that telling the suspect he was free to leave could not cure the custodial

aspect of the interview.'"  Id. (citation omitted).  Other factors include "the duration

of the questioning, statements made during the interview, the presence of physical

restraints during questioning, and 'the release of the interviewee at the end of the

questioning[.]'"  Id. (quoting Howes, 132 S.Ct. at 1189).

Applying these factors to the instant case, the Court finds that Graham was

not in custody for purposes of Miranda during the interview of May 31, 2012.  After

the agents assembled the occupants of the house in a central location and explained

to them that they were executing a search warrant, Agent Harris asked Graham if

he would come with him for questioning.  See (Tr. at 15-16, 37-38).[22]  Agent Harris

then accompanied Graham to a well-lit, private office in the basement of the home

where Graham was seated on a sofa and Agents Harris and Westhall were seated

nearby.  (Tr. at 16, 38).  Graham's handcuffs had already been removed before he

---

[22] Graham asserts that Agent Harris' request "could have been reasonably perceived as a command and a question in respect to punctuation only," [Doc. 41 at 12 (citation omitted)], but this argument is without factual support in the record. Graham offers no explanation as to how Agent's Scott's entreaty–"Will you come with us please?" (Tr. at 37-38)–could plausibly be construed as a command, particularly as there is no evidence that the agents used or displayed any force in making the request, and Graham's handcuffs had already been removed when he went to the basement for questioning, (Tr. at 15-17, 37-38).

went to the basement, and Agent Harris testified that Graham appeared comfortably situated on the couch. (Tr. at 15-17, 42). The agents spoke in a calm tone of voice, no promises or threats were made, and the interview was brief, lasting only 30 minutes. (Tr. at 17, 21-23, 52). Although the agents had initially entered the house with their guns drawn, Agents Harris and Westhall's guns were holstered throughout the interrogation. (Tr. at 16-17). Moreover, the agents expressly advised Graham during the course of the interview that he was not in custody, and Graham responded that he understood, adding that "he knew he did not have to speak with [the agents], and he wouldn't be talking to [them] if he didn't want to help [them]." (Tr. at 17, 20); see also (Tr. at 47-48, 52). At the conclusion of the interview, the agents thanked Graham for speaking with them and escorted him back upstairs, where he sat down with the other residents. (Tr. at 51). From the time the agents entered the residence until their departure, neither Graham nor any of the other occupants were placed under arrest or taken into custody, and Graham was not ultimately arrested until more than a year later. (Tr. at 14-15, 23).

Moreover, the interview occurred in a private office in the comfort of Graham's own home, (Tr. at 16); and while Graham argues that the residence was nonetheless a "police-dominated atmosphere" at the time, [Doc. 41 at 13 (citation omitted)], the fact remains that Graham "was interviewed in familiar surroundings

16

[in]side his own home," United States v. Rogers, Criminal Action No. 1:09–CR–544–TWT–ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010), adopted *sub nom.* United States v. Rodgers, 2010 WL 2697084, at *1 (N.D. Ga. Jul. 7, 2010) (interview during execution of search warrant held not custodial where defendant was questioned in his driveway and was prohibited from re-entering his home until the search was complete), which strongly militates against a finding that the interrogation was custodial, see Matcovich, 522 F. App'x at 851 (citation omitted). Graham also emphasizes that the agents initially told the residents of the house that they were being detained pending the execution of the search warrant, arguing "that a reasonable person would [not] have understood the legal distinction between detention and arrest and thus that he would be released at the conclusion of the agent[s'] investigation and execution of the search warrant." [Doc. 41 at 12-13].  The Supreme Court, however, has "'decline[d] to accord talismanic power' to the freedom-of-movement inquiry," Howes, 132 S. Ct. at 1189 (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)), and thus "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," id.  Indeed, "even where a [d]efendant is detained during the execution of a valid search warrant, courts generally decline to find the defendant 'in custody' in the absence of other factors indicating a coercive atmosphere."  Rogers, 2010 WL 2721883, at * 2 (citing United

17

States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007); United States v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003); United States v. Salyers, 160 F.3d 1152, 1159-60 (7th Cir. 1998)).  The controlling inquiry, then, is not simply whether Graham was detained during questioning, but whether the "detention . . . sufficiently impair[ed] [the] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'"   Howes, 132 S. Ct. at 1189 (citation and internal marks omitted).  The Court is not persuaded that the circumstances of Graham's May 31 interview–where Graham was seated comfortably on a couch in the familiar surroundings of his own home, free from physical restraints, and where the agents spoke to him in a calm tone of voice with their weapons holstered–"present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  Id.  Nor does the mere fact that Graham was temporarily detained during the execution of a routine search warrant suffice to convert the interview into a full-blown custodial interrogation.  In any event, "[t]here certainly was no restraint on [Graham's] freedom of movement of a degree associated with formal arrest," Rogers, 2010 WL 2721883, at *2, which is what is required to establish custody under Miranda, see Brown, 441 F.3d at 1347 (citations omitted).

    In sum, because Graham was not subject to custodial interrogation when the agents spoke with him at his home on May 31, 2012, Miranda warnings were not

required.  The statements were not obtained in violation of <u>Miranda</u>, and they are not due to be suppressed on that basis.  <u>See</u> <u>Matcovich</u>, 522 F. App'x at 852 (interview during execution of search warrant in defendant's residence was non-custodial where entry by law enforcement created a "'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but where, "shortly thereafter, the search warrant was announced, the handcuffs were removed, and the residents were told that they were not under arrest").

### b. **Voluntariness**

Graham also moves to suppress his statements of May 31, 2012, on the ground that the statements were involuntary.  [Doc. 41 at 14-26].  Specifically, Graham contends that the agents' fictitious account of the missing girl constituted an "extreme type of trickery which deprived [him] of an opportunity to make a fair assessment of whether to relinquish his right to remain silent," and which "essentially coerced [him] into defending himself by telling the [agents] what he had truly done." [<u>Id.</u> at 23-24].  The government argues that Graham's statements were voluntary because "they were made during a brief, non-custodial interview," in which Graham "was not subject to any threats and was not physically detained." [Doc. 33 at 15].

19

Although the Court has already determined that Graham's May 31 statements were not taken in violation of <u>Miranda</u>, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Graham] were voluntary in order to admit them at trial." <u>United States v. Lazarus</u>, No. 12–16287, 2014 WL 104212, at *3 (11th Cir. Jan. 13, 2014) (per curiam) (unpublished) (<u>citing</u> <u>United States v. Bernal–Benitez</u>, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances. <u>United States v. Shepherd</u>, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (<u>citing</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"  <u>United States v. Villaverde-Leyva</u>, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." <u>Id.</u> (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345. Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

21

Whether the police employ deceptive tactics to elicit a confession is "one factor to consider among the totality of the circumstances in determining voluntariness." Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). However, "[c]ourts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession coerced and thus involuntary." Aleman v. Vill. of Hanover Park, 662 F.3d 897, 906 (7th Cir. 2011) (citations omitted). Rather, courts have held that "trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (internal marks omitted) (quoting Moran, 475 U.S. at 424). Thus, "[t]he kinds of deception that are generally deemed to trigger suppression are lies about a defendant's legal rights (i.e., 'you must answer our questions'), false promises (i.e., 'whatever you say will be just between us'), or threats (i.e., 'if you don't talk, you won't see your family for a very long time')." United States v. La Forgia, Criminal No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D. Ala. May 22, 2012) (footnote omitted) (citing United States v. Degaule, 797 F. Supp. 2d 1332, 1380 (N.D. Ga. 2011)); see also United States v. Lall, 607 F.3d 1277, 1285-86 (11th Cir. 2010) (citations omitted) (noting that police misrepresentations of fact are not enough to

22

render a confession involuntary, but misrepresentations of law are more likely to do so); Aleman, 662 F.3d at 906 ("The confession must be excluded only if the government feeds the defendant false information that seriously distorts his choice, [for example] by promising him that if he confesses he will be set free—in other words, only if the false statement destroyed the information that he required for a rational choice."); United States v. Rogers, 906 F.2d 189, 191-92 (5th Cir. 1990) (confession not voluntary where police "assured [defendant] that he would not be arrested if he cooperated with them")

Although Graham asserts that the agents' use of deception in this case "[wa]s itself aggravated and standing alone is sufficient basis to hold that [his] statements . . . were the product of coercion," [Doc. 41 at 23], the law in the Eleventh Circuit "is clear, that the police's use of a trick alone will not render a confession involuntary," unless there are "*other* aggravating circumstances" beyond the mere use of deceptive tactics, United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) (emphasis added) (citations omitted); see also Frazier, 394 U.S. at 739 (observing that misrepresentations by the police are "insufficient [by themselves] to make [an] otherwise voluntary confession inadmissible"); United States v. Middleton, 245 F. App'x 867, 872 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (noting that the "single interrogation trick" of lying about the evidence against a defendant,

23

"in the absence of any other aggravating circumstances suggesting coercion on the part of [the police,] does not automatically render [the statement] involuntary"). Indeed, "[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made." Moore v. Hopper, 389 F. Supp. 931, 934 (M.D. Ga. 1974) (citations omitted)); see also United States v. Blue, 122 F. App'x 427, 430 (10th Cir. 2005) (unpublished) (citations omitted) ("Without more, . . . misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary.").

In this case, the ruse about the missing girl was a simple misrepresentation of fact that is by itself insufficient to render Graham's statements involuntary. See Lall, 607 F.3d at 1285-86 (citations omitted). Nor was the ruse accompanied by any aggravating circumstances that would support a finding that Graham's "will [was] overborne and his capacity for self-determination critically impaired." Martin, 770 F.2d at 926 (alteration in original) (citation omitted). To the contrary, the interview took place in Graham's own home, (Tr. at 16), and the agents spoke to him in a calm tone of voice and made no threats or promises, (Tr. at 17, 21-23). The agents did not brandish their weapons, (Tr. at 16-17), and Agent Harris testified that Graham did

24

not appear to be under the influence of drugs or alcohol, and that he appeared to understand what was said to him and responded in a coherent and contextually appropriate manner, (Tr. at 21-23). There is likewise no suggestion that Graham was ever told he was required to answer any questions; in fact, Graham expressly told the agents that he "knew he did not have to speak with [them]," and that "he wouldn't be talking to [them] if he didn't want to help [them]."  (Tr. at 17, 20). Graham was also cooperative throughout the interview and he did not refuse to answer any questions.  (Tr. at 49-50).  Consequently, "[e]ven if the agents did trick [Graham] into thinking the investigation was about [a missing girl], there is no evidence they made any promise that questioning would be limited to that subject, or gave him any assurance that statements relating to other crimes would not be used against him."  United States v. Farley, 607 F.3d 1294, 1349 (11th Cir. 2010) (footnote omitted).

Graham cites to a number of cases in which statements elicited from a defendant in response to police deception were found involuntary, see [Doc. 41 at 17-19 (citing Lynnum v. Illinois, 372 U.S. 528 (1963); Spano v. New York, 360 U.S. 315 (1959); United States v. Irons, 646 F. Supp. 2d 927 (E.D. Tenn. 2009))], but these cases all involve significant aggravating circumstances not present here, see, e.g., Lynnum, 372 U.S. at 534 (mother's confession held involuntary where "made only

after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'"); Spano, 360 U.S. at 321-22 (finding confession involuntary where defendant was foreign-born, had only one-half year of high school education and a history of emotional instability, and was subjected to prolonged late-night questioning that included repeated denials by police of the request to consult with attorney and the threat that if he remained silent his friend on the police force would lose his job); Irons, 646 F. Supp. 2d at 971-72 (confession involuntary where police sought to "exploit [defendant's] friendship" with a female officer, in whom he also had a romantic interest, by falsely telling him that the officer had been arrested and that he "should confess in order to protect her from prosecution"); but see United States v. Charlton, 565 F.2d 86, 89 (6th Cir. 1977) (confession voluntary notwithstanding police threats to arrest son absent cooperation).[23]    Indeed, the cases cited by Graham illustrate nothing short

_____

[23] Compare also Rogers v. Richmond, 365 U.S. 534 (1961) (confession coerced when police threatened to take suspect's wife into custody if he did not confess); United States v. Alcarez–Mora, 246 F. Supp. 2d 1146, 1154-55 (D. Kan. 2003) (under totality of the circumstances, officer's statement to defendant that if he failed to cooperate he would "never see his daughters again," caused confession to be coerced); Robinson v. Smith, 451 F. Supp. 1278, 1290-93 (W.D.N.Y. 1978) (confession held involuntary where defendant with a fifth-grade education was questioned all night, was not told of his constitutional rights, was misleadingly informed he would benefit by confession, and was presented with a false confession by his accomplice) with Frazier, 394 U.S. at 737-39 (finding statement voluntary despite the fact that police lied to defendant about his co-defendant's statement because the questioning was of short duration and the defendant was a "mature individual of normal

of "extreme forms of deception or chicanery," <u>United States v. Jacques</u>, 744 F.3d 804, 812 (1st Cir. 2014) (citations and internal marks omitted), which are far removed from the ruse used here.  Moreover, the defendants in those cases were given the impression by police that they could avert some impending harm that would otherwise befall their family or friends, if only they would "cooperate" with the investigation.  In this way, they were essentially confronted with the dilemma of either cooperating with the police or else allowing their loved ones to suffer as a result of their own recalcitrance, which "not only impaired [the defendants'] free choice, but also cast doubt upon the reliability of the resulting confession," <u>Holland</u>, 963 F.2d at 1051.  Here, in contrast, there is not the slightest hint that the agents rendered Graham's confession unreliable by confronting him with a similar

---

intelligence"); <u>United States v. Anthony</u>, Criminal Case No. 1:11-CR-0326-SCJ-JFK, 2012 WL 684844, at *6 (N.D. Ga. Jan. 20, 2012), adopted by 2012 WL 684802, at *1 (N.D. Ga. Mar. 2, 2012) (statement voluntarily made, notwithstanding police misrepresentations about the reason for the interview, where the atmosphere was cordial, the agents did not use force, draw their weapons, or make any promises or threats, and defendant never told the agents he did not want to speak to them); <u>Martin</u>, 770 F.2d at 925 (finding statement voluntary even though it came after a five-hour interrogation in which one detective raised his voice at the defendant, cursed at him, discussed the death penalty, lied to him by stating a co-defendant had confessed, ignored his request to suspend questioning until the next day, and falsely assured him that the truth could not hurt him); <u>Edwards v. McNeil</u>, No. 3:09-cv-575-J-20JRK, 2011 WL 98407, at *6 (M.D. Fla. Jan. 12, 2011) (citation omitted) (statement voluntary notwithstanding "a certain amount of deception and trickery . . . by the police during the interview" because there were not "'other aggravating circumstances,' like hours of questioning in a hostile environment of an uneducated and mentally unstable or vulnerable defendant").

ultimatum that directly implicated any close personal or familial relations.  And if Graham was actually deceived by the ruse and agreed to speak with the agents in order to help them find the missing girl, as he appears to allege, see [Doc. 41 at 5, 24-25], this would not make his statements less reliable, since it would have been counter-productive for him to provide the agents with false information that would only impede their efforts to locate her.[24]

─────────────────

[24] Graham also cites to a second line of cases in which law enforcement tricked the defendant into consenting to an unlawful search under the Fourth Amendment. See [Doc. 41 at 19-22 (citing United States v. Vazquez-Velazquez, Criminal Indictment No. 1:11–CR–212–TCB–GGB, 2012 WL 917845, at *5-8 (N.D. Ga. Feb. 23, 2012), adopted by 2012 WL 912787, at *1 (N.D.Ga. Mar. 16, 2012); United States v. Montes–Reyes, 547 F. Supp. 2d 281, 290 (S.D.N.Y. 2008); Krause v. Kentucky, 206 S.W.3d 922, 924-28 (Ky. 2006))].  As the government points out, however, the subterfuge employed in these cases represented an attempt by law enforcement to circumvent the ordinary requirement of obtaining a warrant prior to entry of a residence, whereas here, "law enforcement was present in [Graham's] home pursuant to a valid search warrant and probable cause had already been established that a crime was taking place within the home."  [Doc. 45 at 8-9].  Because the ruse in this case does not involve a similar "end around the Fourth Amendment" or any other constitutional protections, the Court agrees with the government that the cases cited by Graham are inapposite.  See [id. at 9].  Moreover, the cases relied on by Graham dealt with the issue of police deception in the specific context of determining whether a search was reasonable under the Fourth Amendment; the cases simply do not address the issue of whether a suspect's statements are rendered involuntary within the meaning of the Fifth Amendment, by police deception or otherwise, which is the issue before the Court.  Because the reasoning in these cases is based on a different line of jurisprudence arising from a distinctly different set of factual circumstances with differing constitutional implications than the issue under consideration here, the Court is not persuaded by Graham's contention that the cases are nonetheless analogous for purposes of resolving his motions to suppress statements, see [Doc. 41 at 19-22], and Graham's arguments in this regard will not be considered further herein.

Graham further suggests that his statements should be suppressed because it was inappropriate for the agents to use deception in order "to exploit [Graham's] civic desire to assist the police." [Doc. 41 at 22 (citations omitted)]. However, when confronted by law enforcement agents, a suspect must *always* gauge his own self-interest against the broader public interest in assisting the agents in their official duties, even where the agents are completely forthcoming. In other words, had the agents in this case opened the interview by truthfully telling Graham that they were investigating the possession and distribution of child pornography that had been traced to his residence, Graham would still have had to decide whether to cooperate by weighing his personal interest in declining to speak with the agents against the civic interest in facilitating the enforcement of the law by divulging useful information that would expose him to potential criminal liability. And the record before the Court establishes that Graham's decision to make incriminating statements to the agents was voluntary as he even expressly acknowledged that he knew he did not have to speak with them. (Tr. at 17, 20).[25]

---

[25] Graham also suggests that the agents' use of deception in this case was the reason that he cooperated with them, as he expressly told the agents that "he [was] talking to them because he wanted to help in their investigation concerning the child." [Doc. 41 at 24-25]. While that may be so, the reason that Graham ultimately decided to speak to the agents is not dispositive, since whether the "agents' misrepresentations may [have] cause[d Graham] to confess" is not the issue; indeed, "the issue is not causation, but the degree of improper coercion, and in this instance the degree was slight." Holland, 963 F.2d at 1051; see also id. (quoting Miller v.

In brief, "the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case," Farley, 607 F.3d at 1328 (citation omitted), and the circumstances in this case simply do not show that the agents' misrepresentation about a missing girl, unaccompanied by any aggravating factors, rose to the level of "coercive police activity," see Connelly, 479 U.S. at 167, that so overpowered Graham's will or "critically impaired" his "capacity for self-determination," as to render his statements involuntary, see Martin, 770 F.2d at 926 (citation omitted). Indeed, "[f]ar from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here[.]" Aleman, 662 F.3d at 906 (internal marks omitted) (quoting United States v. Rutledge, 900 F.2d 1127, 1130-31 (7th Cir. 1990)).  See also United States v. Grossman, 233 F. App'x 963, 966-67 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (where defendant was interrogated about attempt to entice a minor based on communications with an agent who falsely assumed the identity of the minor's mother, the "agents' use of the ruse that a real mother and daughter were involved, that the mother was arrested, and that the daughter was placed in

---

Fenton, 796 F.2d 598, 605 (3d Cir. 1986), cert. denied, 479 U.S. 989, 107 (1986) ("[C]ausation alone does not constitute coercion; if it did, all confessions following interrogations would be involuntary because 'it can almost always be said that the interrogation caused the confession.'")).

protective custody d[id] not diminish the non-coercive nature of the interview"). Accordingly, the ruse employed by Agents Harris and Westhall "did not amount to coercion in violation of [Graham's] Fifth Amendment rights," Jacques, 744 F.3d at 812, and the totality of the evidence in this case demonstrates that Graham's statements at the interview of May 31, 2012, were made voluntarily.

### 2.    *Statements of September 25, 2013*

In his initial motions to suppress statements, Graham sought to suppress both the statements he made following his arrest on September 25, 2013, as well as his statements of May 31, 2012.  [Docs. 14 & 19].  In his post-hearing brief in support of those motions, however, Graham argues exclusively for the suppression of the May 31 statements, without making any reference to the statements of September 25, 2013.  The government argues that the September 25 statements are admissible because they were made voluntarily after Graham waived his Miranda rights, [Doc. 33 at 16-18], and Graham does not dispute that the government has successfully carried its burden of establishing the admissibility of those statements on either of those grounds.  See generally [Doc. 41].

The government bears the burden of proving by a preponderance of evidence that Graham validly waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997).  See also Connelly, 479 U.S. at 168-69.  In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature,

create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467.  To address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures which law enforcement officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily. Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the *Miranda* rights have been waived.

Patterson, 2007 WL 2331080, at *3 (citation omitted) (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)). See also Moran, 475 U.S. at 421; Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002). To find a waiver involuntary, coercion by law enforcement is a "necessary predicate," Connelly, 479 U.S. at 167, and "in the absence of [such] coercion a court cannot conclude a defendant's waiver or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

In this case, after Agent Scott advised Graham of his Miranda rights by reading the rights from an HSI Miranda rights card, (Tr. at 60; Def. Ex. 3), Graham responded that he was willing to talk and he proceeded to answer Agent Scott's questions. (Tr. at 60). Agent Scott testified that he spoke to Graham in a conversational tone, and that neither he nor any other agents threatened Graham,

raised their voices at him, or made any promises to him.  (Tr. at 62); see also (Gov. Ex. 4).  There is no indication that Graham ever asked for clarification or to stop the interview or request counsel, or that he otherwise indicated in any way that he did not understand his rights or the consequences of his waiver.  See generally (Gov. Ex. 4).  Indeed, Agent Scott stated that Graham was "not confrontational," but "very cooperative" and "very compliant the whole time," adding that Graham also appeared to "express[] remorse" for what he had done.  (Tr. at 63, 67).  Agent Scott further related that his gun was holstered and was not visible to Graham during the interview because it "would have been blocked" by the Expedition's "bulky" center console.  (Tr. at 63, 72).  Moreover, Graham had scarcely been detained for a minute before Agent Scott advised him of his Miranda rights and began questioning him, and the interview itself lasted less than five minutes.  (Tr. at 69; Gov. Ex. 4).  Finally, Agent Scott testified that Graham did not appear to be under the influence of drugs or alcohol, that he seemed to understand what was being said to him, and that he responded in a coherent and contextually appropriate manner.  (Tr. at 62); see also (Gov. Ex. 4).  On these facts, the government has shown that, under the totality of the circumstances, Graham was aware of the nature of his rights being abandoned and the consequences of his decision to abandon them and that he knowingly, intelligently, and voluntarily waived his Miranda rights.

36

**B.    Motions to Suppress Evidence**

Graham initially moved to suppress the items seized on May 31, 2012, on the grounds that the supporting search warrant was overly broad in violation of the Fourth Amendment and that the return and inventory of the warrant were defective under Rule 41 of the Federal Rules of Criminal Procedure.   [Docs. 17 & 18]. However, the only basis articulated in Graham's post-hearing brief for the suppression of evidence is that the evidence constitutes the unlawful fruits of the statements he seeks to exclude.  See [Doc. 41 at 25].  Since Graham no longer argues that the search warrant of May, 2012, was in any way defective or that its subsequent inventory and return were improper, see generally [Doc. 41], these grounds for suppression may be deemed to have been abandoned.  See United States v. Alvarado-Linares, Criminal Action No. 1:10–cr–86–1–RWS–ECS, 2012 WL 7984071, at *1 (N.D. Ga. June 18, 2012), adopted by 2013 WL 1702782, at *1 (N.D. Ga. Apr. 18, 2013) (defendant abandoned arguments made in initial motions to suppress by failing to raise them in post-hearing brief); United States v. Zekic, Criminal Action No. 1:10–CR–110–TCB–CCH, 2010 WL 4962985, at *1 (N.D. Ga. Oct. 28, 2010), adopted by 2010 WL 4967825, at *1 (N.D. Ga. Dec. 1, 2010) (internal marks omitted) (quoting Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004)) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that

has not been briefed before the court is deemed abandoned and its merits will not be addressed.").  However, even if Graham has not abandoned these arguments, they do not support his motions to suppress evidence, and the Court will thus address each of Graham's arguments in turn.

### 1.   *Scope of Search Warrant*

Graham asserts that the May 25, 2012, search warrant was overly broad and exceeded the scope of probable cause because it was not limited to "items identified as belonging to or having connection to" the owner of the home, Parkinson, and that the search was overly broad and unreasonable under the Fourth Amendment because "no attempt at restricting the search to the property of [Parkinson], was made or directed."  [Doc. 17 at 2-3].  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  See also Fed. R. Crim. P. 41.  "'In order for a search to be reasonable, the warrant must be specific.  Specificity has two aspects: particularity and breadth.  Particularity is the requirement that the warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'" United States v. Maali, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004), *aff'd*, United

States v. Khanani, 502 F.3d 1281 (11th Cir. 2007) (citation omitted) (quoting In re Grand Jury Subpoenas Dated Dec. 10, 1987 (Does I Through IV v. United States), 926 F.2d 847, 856-57 (9th Cir. 1991)).

"'The scope of the warrant, and the search, is limited by the extent of the probable cause. . . . [P]robable cause must exist to seize all the items of a particular type described in the warrant,' and '[t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant.'" Id. at 1239-40 (alterations in original) (citation omitted) (quoting In re Grand Jury Subpoenas, 926 F.2d at 857).  Therefore, "[a] warrant must [] be 'no broader than the probable cause on which it is based.'"  United States v. Banks, No. Cr. 06-051-S-BLW-WBS, 2006 WL 3093139, at *4 (D. Idaho Oct. 27, 2006), aff'd, 556 F.3d 967 (9th Cir. 2009) (citation omitted) (quoting United States v. Weber, 923 F.2d 1338, 1342 (9th Cir. 1991)).  "The fact that the warrant called for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity."  United States v. Sugar, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985).

Here, the search warrant described with sufficient particularity the items to be seized and limited these items to evidence relating to child pornography as defined by 18 U.S.C. § 2256.  See (Gov. Ex. 1).  Thus, the warrant was not a general

warrant.  Additionally, Agent Harris' affidavit provided sufficient probable cause to establish that evidence of this crime would be located in the residence at 2493 Redwine Road, Fayetteville, Georgia, see (Def. Ex. 1), and Graham does not contend otherwise, see generally [Docs. 17, 18 & 41].  Instead, Graham complains that the search warrant was not confined to authorizing only the seizure of property of the owner of the residence, Parkinson, since the affidavit in support of the search warrant application identified Parkinson as the suspect who possessed and distributed child pornography.  [Doc. 17 at 2-3].  However, contrary to Graham's contention, Agent Harris' affidavit did not identify Parkinson as "the [] suspect," [id. at 3], but merely as the person who was the subscriber to the IP address  from which the child pornography had been downloaded and the owner of record of the residence to be searched, see (Def. Ex. 1).  Thus, the affidavit established probable cause to believe that evidence relating to child pornography would be found in the residence, not that Parkinson was necessarily the person who used the computer at that residence to possess and distribute child pornography.

"'A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the illegal activities of one of several occupants of a residence.'"  United States v. Esterline, 287 F. App'x 693, 699 (10th Cir. 2008) (unpublished) (quoting United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991)).  "In this case, the evidence authorized

for seizure might have been found in any room in the home, and the warrant was not overbroad in allowing the agents to search throughout the house for those items." United States v. Rubinstein, No. 09-CR-20611-CR, 2010 WL 2723186, *9 (S.D. Fla. June 24, 2010), adopted by 2010 WL 2681364, at *1 (S.D. Fla. July 7, 2010) (citation omitted) (rejecting defendant's argument that search should have been limited to a particular individual's room and property in a residence, where "the search warrant authorized the search of a single family home, and from the warrant application there was every reason to believe that the occupants were not restricted to particular rooms within that home").[26]  Accordingly, Graham's motion to suppress evidence on the basis that the search warrant was overly broad, [Doc. 17], is without merit.

---

[26] Additionally, under the good-faith exception to the exclusionary rule, established by the Supreme Court in United States v. Leon, 468 U.S. 897, 922 (1984), "evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate judge generally should not be suppressed under the exclusionary rule if it turns out later that the magistrate judge erred in finding probable cause." United States v. Ramirez, No. 13–20866–CR, 2014 WL 835702, at *4 (S.D. Fla. Mar. 4, 2014), adopted at *5 (citation omitted).  Consequently, "even if the search warrant were overly broad or otherwise deficient—a finding that this Court does not make—the good-faith exception to the exclusionary rule would preclude suppression." Id. (good faith exception applied to search for evidence of child pornography in single family home, where "the affiant candidly suggested that probable cause existed only that someone—but not who—had violated the child-pornography laws from the [home], and the affiant sought authorization to conduct a search of the entire [home] to identify who the perpetrator of the child-pornography transmissions was"; "[u]nder these circumstances, the officers could reasonably rely on the validity of the search warrant as issued for the entirety of the [home]").

## 2.    *Search Warrant Returns*

Graham's motions to suppress evidence based on his contention that the searches were illegal because the warrants for each search were not timely returned along with an inventory of the items seized as required by the Federal Rules of Criminal Procedure, [Doc. 17 at 3-4; Doc. 18 at 1-2], also are meritless.   Rule 41(f)(1)(D) of the Federal Rules of Criminal Procedure provides that "[t]he officer executing the warrant must promptly return it--together with a copy of the inventory--to the magistrate judge designated on the warrant."   Fed. R. Crim. P. 41(f)(1)(D).   The rule does not establish a specific time period within which a search warrant must be returned, only that it be done so promptly.

In this case, the May, 2012, search warrant was returned on June 11, 2012, 11 days after the warrant was executed on May 31, 2012.   (Gov. Ex. 1).   The search warrant of September, 2013, was returned on September 27, 2013, two days after it was executed on September 25, 2013.   (Gov. Ex. 2).   Thus, the Court has no trouble in finding that the returns were made promptly as required by Rule 41(f)(1)(D). See United States v. Gerald, 5 F.3d 563, 567 (D.C. Cir. 1993) (warrant not returned until five months after the search had been conducted did not provide grounds for suppression of evidence obtained pursuant to the warrant).   Moreover, even when a warrant is not returned in compliance with the Federal Rules of Criminal

Procedure, "[v]iolations of Rule 41(f) 'are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith,'" United States v. Henry, 939 F. Supp. 2d 1279, 1290 (N.D. Ga. 2013), adopted at 1284-85 (footnote and citations omitted) (quoting United States v. Marx, 635 F.2d 436, 441 (5th Cir. Unit B, 1981)[27]), and Graham has made no such showing, see id. at 1290 (alleged violations of inventory and return requirements under Rule 41(f) did not require suppression of evidence seized pursuant to those warrants because defendant failed to demonstrate, inter alia, "that the search would not have occurred or would have been conducted differently if the requirements of Rule 41(f) had been followed"). Accordingly, Graham's motions to suppress based on the alleged failure to promptly return the warrants, [Docs. 17 & 18], are due to be denied.

### 3.   *Fruit of Statements*

Graham also moves to suppress any evidence that was seized as the result of his statements, which he contends were unlawfully obtained. See [Doc. 41 at 25]. However, Graham does not identify which evidence in particular he seeks to suppress, nor does he allege that any of the evidence seized was, in fact, acquired

---

[27] In Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit.

by reason of his statements, and not, rather, as the product of the valid search warrants issued in this case.  See generally [id.].  Indeed, in his post-hearing brief, Graham makes no argument and cites no authority in support of his motions to suppress evidence, nor does he even so much as mention the suppression of evidence, other than to request, in the final sentence of his brief, that the Court exclude "any and all evidence obtained . . . as fruit of his statements, including computers, DV[Ds] and other media-related items which [he] admitted to possessing and [of which he] provided information to the agents concerning where they would be found."  [Id. at 25].  The government contends that the evidence seized from Graham's residence should not be suppressed since it "was seized pursuant to a valid search warrant and not as fruit of [Graham's] statements."  [Doc. 45 at 10 (emphasis omitted)].

Under the doctrine of the "fruit of the poisonous tree," "evidence otherwise admissible but discovered as a result of an earlier [constitutional] violation is excluded as tainted" in order to discourage future police misconduct.  Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004).  "[T]ainted fruit can grow only on poisonous trees," however; "that is, . . . derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation."  Bruno v. Cunningham, No. 03 Civ. 937(MBM), 2004 WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citation omitted); see also id. (citing Oregon v. Elstad, 470 U.S. 298, 308 (1985)).  See

44

also id. (citation omitted) ("Absent an underlying wrong, the fruit-of-the-poisonous-tree doctrine simply does not apply.").  The Court has not found evidence of a prior constitutional violation preceding the seizure of evidence in this case, but has instead determined that Graham's statements were lawfully obtained because they were made voluntarily and in accordance with the dictates of Miranda.  Because there was "no actual infringement of [Graham's] constitutional rights," see Elstad, 470 U.S. at 308, which resulted in the subsequent acquisition of the evidence against him, Graham's argument is without merit, and his motion to suppress evidence as the fruit of his prior statements is therefore due to be denied.[28]

In short, because the agents "seize[ed] evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier [constitutional] violation, there is an independent source for the seizure[s], and the evidence is untainted and admissible." United States v. O'Brien, 498 F. Supp. 2d 520, 540 (N.D.N.Y 2007) (citing Murray v. United States, 487 U.S. 533, 540-41 (1988)). Accordingly, the evidence seized from Graham's residence on May 31, 2012, and September 25, 2013, is not due to be suppressed as fruit of the poisonous tree or

---

[28] Indeed, the May 25, 2012, search warrant could not have been tainted by any alleged illegality in obtaining Graham's statements because the search warrant was issued before Graham made any statements to the agents on May 31, 2012.

otherwise, and it is hereby **RECOMMENDED** that Graham's motions to suppress evidence, [Docs. 17 &18], be **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Graham's motions to suppress evidence and statements, [Docs. 14, 17, 18 &19], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 28th day of May, 2014.


_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE